NIAGARA TRANSIT CO. v. NORTHWESTERN FUEL CO.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1919.)

No. 2612.

WHARVES ☜20(1)—COLLAPSE OF COAL UNLOADING BRIDGE—ACT OF GOD.

The collapse during a storm of a steel unloading bridge on respondent's coal dock weighing 1,200 tons, new and of approved and modern construction, by which libelant's vessel was injured, *held* not due to negligence which rendered respondent liable, but to the entirely unusual violence of the storm which could not reasonably have been anticipated.

Appeal from the District Court of the United States for the Western District of Wisconsin.

Suit by the Niagara Transit Company against the Northwestern Fuel Company. Decree for respondent, and libelant appeals. Affirmed.

Fred W. Ely and John B. Richards, both of Buffalo, N. Y., for appellant.

L. K. Luse, of Superior, Wis., for appellee.

Before BAKER, MACK, and ALSCHULER, Circuit Judges.

ALSCHULER, Circuit Judge. The action was in admiralty for damages to appellant's boat William A. Rogers through the collapsing

of appellee's coal unloading bridge at its Superior, Wis., dock where the boat was moored for unloading. The bridge was a steel structure, having a trussed span of over 500 feet, weighing about 1,200 tons, its lower chords 80 feet from the surface, and the truss about 40 feet high. It was supported on huge steel legs, one set (called the shear legs) near the water end of the dock, and another (called the pier legs) at the opposite end; the span extending normally at about right angles to the water line. The legs rested firmly on massive compound trucks, each having twelve flanged wheels which ran on heavy rails laid on the dock parallel to the water line, the rails for each set of trucks being about 2 feet apart. Electrically driven devices operated the six driving wheels of each truck whereby the bridge could be moved either way along the rails so that boats might be unloaded at any point along this thousand or more feet of dock front served by this bridge, and the coal deposited anywhere upon the dock under the bridge.

At the shear end of the span there was a raisable arm or apron nearly 80 feet long, which, when in position for unloading boats, was extended forward on the plane of the lower chords of the span making of it a continuation of the bridge, held in position over the boat by heavy cables from the upper part of the span. This apron or extension was so attached to the lower part of the span that when desired it could be raised by the cables, and when at its full height it stood about ten degrees forward from a position rectangular to the floor of the span, and held in place by the cables. Along the underside of the span and of the extended apron there was a trolley arrangement whereby a small suspended trolley house could be moved underneath and along the entire span and apron of the structure. From it, suspended by heavy cables, was the bucket or "clam" for unloading the boats. This was in two parts, weighing empty 14 tons, and of 10 tons capacity.

The boat to be unloaded was made fast to the dock and the trolley and clam were then run out on the apron over an open hatch of the boat. The open clam was lowered into the hatch and being raised gathered and held its capacity of coal, and was run back on the bridge and dumped at the place desired. As the various hatches were emptied, others were reached by moving the bridge or the boat or both. To load, dump, and return the bucket required about a minute.

A single operator in the trolley house controlled the movement of the bridge along the rails as well as the movements of the bucket, and the raising and lowering of the apron when this was required. Hand and foot levers operated the necessary electrical machinery. For the very essential function of holding the bridge at any desired place on the rails there were brakes and rail clamps. The brakes engaged the driving wheels, and were set automatically when the driving power was off the wheels, and after the brakes were set the automatic descent of a very heavy weight caused strong heavy clamps to engage the rails. Thus each time the operator threw off the power that moved the bridge along the rails, the holding mechanism became automatically effective.

In addition to these automatic holding devices, appellee had procured and had placed for convenient access on the trucks certain devices for additional security in case of emergency, consisting of chock blocks with bolts, designed to be firmly bolted to the tracks so that when in place they would rest upon the rails and against the forward wheels; the blocks being curved to engage the wheels almost to the point of their contact with the rails.

In building the structure provision was made for some skew movement whereby the shear legs might move some distance, about 70 feet, either way from rectangular position, without endangering the bridge.

On the day in question, while the boat was being unloaded, a storm of great violence came on, forcing the shear end of the bridge to move along the rails so far as to collapse it, and the extension or apron, which with the clam, was over the boat, fell upon it, causing the damage for which the recovery is sought.

Appellee contends that the storm which caused the movement and the collapse of the bridge was one of unprecendented violence, and that for the damage occasioned by this "act of God," unmixed with any negligence on its part, it cannot be held liable. Appellant maintains that the violence of the storm was not unprecedented at this place; also, that appellee did not exercise proper care to secure the structure to the rails, and that it was not properly secured, and that this fact, coupled with the negligent operation of the bridge and bucket in the face of the impending storm, was the proximate cause of the collapse.

The evidence was voluminous, orally given before the district court, which found for appellee, acquitting it of any negligence in the construction and operation of the bridge, finding that the injury complained of was caused wholly by "an act of God," through this storm which it found to have been unprecedented in its violence.

The questions are purely of fact, and the evidence consists wholly of the transcript of that which was adduced in the district court. That appellee exercised all due care in the selection and erection of the bridge is very evident. The structure was new, having been in use only about six months. It was built on the then most approved plan by constructors presumably of the highest skill, and the evidence affords no ground for any charge of negligence in this regard.

As to the appliances for holding the bridge to the rails the evidence in our judgment warrants the conclusion of their sufficiency for all contingencies which might in reason have been anticipated. That the brakes were set and the clamps were in proper engagement is sufficiently shown by evidence of the physical condition of the parts after the occurrence. But in addition to these, with warning of an approaching windstorm the chock blocks were bolted to their intended places on the rails. But all these together were not sufficient to stop the movement of the shear end of the bridge.

The fact of the movement against the combined holding power of these appliances, far from sustaining the contention of negligence through alleged failure to afford sufficient anchorage, in our opinion

gives but added proof of the extreme violence of the storm, which is after all the factor most determinative of this controversy. There was evidence of the records kept at the nearest weather bureau at Duluth of a number of previous storms whose recorded velocity in mileage was greater than the same records showed this one to be. But the office of this bureau is about four miles from the scene of the accident, and from the velocity of the wind as there recorded it does not follow but that it may have been much greater at this place. Indeed, the physical manifestations appearing from the evidence render it altogether probable that such was the fact. In the more immediate vicinity of this accident freight cars were blown over, buildings unroofed and moved, and large boards were carried through the air and upwards at such velocity as to drive them through the overhanging roof of an adjacent building with such force that they remained there; and other bridge structures in the vicinity were also blown down. Half a dozen witnesses, familiar with the location, testified that this was the most violent storm they had ever experienced at this place. From the oral evidence on this subject, which the District Court heard, not only are we unable to say that the court erred in concluding that this was a storm of unexampled violence, but from its perusal we are quite satisfied that had we heard it our conclusion would have been the same.

It is urged that, even conceding the storm to have been unprecedented in violence, there was negligence in operating the bridge practically up to the time it began to move, and in failing to have run the clam back under the bridge structure and raised the apron so it would not have been over the boat. It is true that the storm was a long time in breaking and reaching its full fury, and that the wind blew quite strongly for a considerable time before the accident. Appellee's superintendent had given orders to clamp down the bridge and hold it. The order did not say that it should not be operated. It was moved to a full hatch and then clamped down, as stated; but the work of unloading continued until very shortly before the accident. The evidence warrants the conclusion that just prior to the accident there was a very sudden and violent increase in the velocity of the storm, caused probably by the meeting there of two distinct storm centers, and that it was the sudden cyclonic action of the storm that caused the bridge to move as it did. In our judgment the operation of the bridge just before the accident was not such an unreasonable thing to be done as to amount to negligence on the part of appellee.

If the apron or extension had been raised it is more than possible that the bridge in falling would not have struck the boat, since it seems the main damage to the boat was done by the falling upon it of this apron which extended above it. The raising of the apron was not a trivial operation. The evidence varied as to the time required to raise it—from three to twelve minutes—and it could not be said that this structure, if in standing position about 80 feet upward from the bottom of the span, would not, in case of collapse, have fallen forward and upon the vessel, with even more damaging effect from the height to which it might have been raised. When the bridge collapsed

there is no certainty that the apron would have fallen backward; indeed, it is very possible that it might have fallen in the direction toward which when raised to its full height it was normally inclined, viz., toward the boat. The apron when raised high above the span might through the action of the wind have had tendency to impart a twist to the span wholly apart from the skew action through movement of the trucks, and negligence might perhaps with equal show of reason have been attributed to the raising of the apron under such circumstances. The probable effect of the raising or lowering of the apron is entirely too speculative to predicate actionable negligence on what in fact was done.

In our judgment the evidence warranted the conclusion expressed by the District Court that the storm was "entirely unusual in its violence, and could not reasonably have been anticipated, and was the sole cause of the injury." For the consequences of such "act of God," unmixed with negligence, appellee was properly held to be not answerable.

The decree of the District Court is affirmed.